AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
2/18/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ASI  DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
02/18/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: IV  DEPUTY

United States of America

v.

GREGORY JAIQUAN MONROE HALL,

Defendant

Case No. 2:25-mj-00782-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of February 16, 2025 in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with Intent to Distribute Cocaine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Stefan Cvijanovic
*Complainant's signature*

Special Agent Stefan Cvijanovic, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: February 18, 2025

*Judge's signature*

City and state: Los Angeles, California

Hon. Patricia Donahue, U.S.M.J.
*Printed name and title*

AUSA: Matt Coe-Odess, x8957

**ATTACHMENT A**

ITEMS TO BE SEARCHED

    1.    The following digital devices (the "SUBJECT DEVICES"), seized during the arrest of HALL or about February 16, 2025, and held in the custody of Homeland Security Investigations ("HSI"), in El Segundo California:

    2.    One iPhonebearing IMEI number "35 158197 237581 4," ("SUBJECT DEVICE 1"); and

    3.    One blue iPadbearing serial number "CHHF9GGPRY" ("SUBJECT DEVICE 2").

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances), (the "Subject Offenses"), from January 1, 2024, to February 17, 2025, namely:

   a. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

   b. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the SUBJECT DEVICES and which relate to the Subject Offenses;

   c. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from the SUBJECT DEVICES and which relate to the Subject Offenses;

      d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

      e.    Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs and the collection or transfer of the proceeds of the Subject Offenses;

      f.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

    2.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

    3.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

      a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses,

Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        c.    evidence of the attachment of other devices;

        d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        e.    evidence of the times the device was used;

        f.    passwords, encryption keys, and other access devices that may be necessary to access the device;

        g.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        h.    records of or information about Internet Protocol addresses used by the device; and

        i.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

**SEARCH PROCEDURE FOR THE SUBJECT DEVICE**

  5. In searching the SUBJECT DEVICES or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

    a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the Subject Offenses or containing data falling within the scope of the items to be seized.

    b. The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

    c. The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the SUBJECT DEVICES and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

    d. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i. The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also

4

search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

    ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

    iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

  e. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

  f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

  g. If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

  h. If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the

5

government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   i. The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

   j. After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

  6. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

  7. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Stefan Cvijanovic, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint against and arrest warrant for Gregory Jaiquan Monroe HALL ("HALL"), for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Cocaine.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES"), seized during the arrest of HALL on February 17, 2025, and held in the custody of Homeland Security Investigations ("HSI"), in El Segundo, California, as described more fully in Attachment A:

   a. One iPhone, bearing IMEI number "35 158197 237581 4," ("SUBJECT DEVICE 1"); and

   b. One blue iPad bearing serial number "CHHF9GGPRY," ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a Special Agent with HSI, currently assigned to the Office of the Assistant Special Agent in Charge, Los Angeles International Airport ("LAX").

6.  In 2022, I completed the Criminal Investigator Training Program, and in 2023, I completed the HSI Special Agent Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. During these programs, I received training in HSI's criminal investigative and arrest authority, as well as investigative techniques for conducting criminal investigations, including special training in investigations regarding narcotics.

7.  I was previously employed as a United States Customs and Border Protection ("CBP") Officer since 2013. I have completed Basic Inspector (CBP) training at the Federal Law Enforcement Training Center in Brunswick, Georgia.

### III. SUMMARY OF PROBABLE CAUSE

8.  On February 16, 2025, HALL attempted to travel from LAX to Sydney, Australia. HALL checked one suitcase onto the flight.

9.  During an inspection of HALL's checked suitcase, CBP LAX Officers identified anomalies. CBP Officers searched the suitcase and found a silver bag containing five packages of suspected cocaine at the bottom of the suitcase. The suspected cocaine was tested using the Thermo Scientific Gemini Analyzer, which yielded a positive result for cocaine. The cocaine weighed a total of approximately 5.76 kilograms.

10. When questioned about the suitcase, HALL said the suitcase was his but claimed that he did not know what was in the silver bag. HALL said that someone named "Monie" had "tricked" him. HALL said that an unknown individual working with Monie had delivered the bag to him at a park earlier that night, and that HALL did not have time to look in the bag. HALL said that Monie had previously approached him in October or November 2024 about delivering drugs, and that HALL had rejected Monie's suggestion. HALL said he thought the bag contained clothes for a modeling show in Australia.

11. At the time of his arrest, HALL presented the SUBJECT DEVICES and stated the devices belonged to him.

### IV. STATEMENT OF PROBABLE CAUSE

12. Based on my involvement in this investigation, my conversations with other law enforcement officials involved in

this investigation, and records connected to this investigation, I know the following facts:

### A. HALL possessed 5.76 kilograms of cocaine inside of his checked luggage

13.  According to CBP, HALL arrived at LAX on February 16, 2025, and checked one large grey Samsonite suitcase onto his American Airlines flight scheduled to fly to Sydney, Australia. The suitcase was affixed with a bag tag bearing his name.

14.  After HALL checked his suitcase, the suitcase was screened pursuant to CBP's international flight screening protocols and border search authority, which is designed in part to curb current narcotics smuggling trends from the United States to Australia.

15.  During the initial x-ray screening, CBP flagged the suitcase for further inspection due to anomalies.

16.  According to CBP Officers, HALL's checked bag was locked with two luggage locks. Both luggage locks required a key in order for the bag to be opened.

17.  During the physical search of HALL's suitcase, under men's clothing and other personal items, CBP found a silver bag at the bottom of the suitcase. Inside the silver bag, CBP found five black packages in a brick shape. These packages contained a white powder substance that appeared to be cocaine.

4

18. The substance was tested using the Thermo Scientific Gemini Analyzer.[1] The test yielded a positive result for cocaine. The five bags weighed a total of approximately 5.76 kilograms.

### B. HALL claimed that someone named "Monie" tricked him into transporting the drugs

19. On February 16, 2025, I arrived at the CBP Secondary Examination Area in the Tom Bradley International Terminal at LAX. CBP Officer Robert Rector told me that HALL had been pulled aside by CBP personnel as HALL was trying to board his flight to Australia.

20. HSI Task Force Officer Daniel Dang and I interviewed HALL in an office located inside the CBP Secondary Inspection Area at LAX. The following is a summary of the interview and does not purport to set forth all facts or knowledge involved in the interview:

    a. I advised HALL of his *Miranda* rights. HALL stated that he understood his right and agreed to speak with us;

    b. HALL said he did not pack the silver bag that contained cocaine. HALL said that he received the bag that night at a park. HALL said he did not know the individual who gave him the bag but that someone named "Monie" or "Mony" (hereinafter "Monie") sent the person. HALL said he did not have time to open the bag, but that he thought the bag contained clothes.[2]

---

[1] Based on my training and experience, I know that the Thermo Scientific Gemini Analyzer is a machine that allows one to scan drugs through a container and is capable of identifying the type of narcotic being tested.

[2] HALL said he was going to Australia to model in a show called "Eco." HALL could not provide any other details about
*(footnote cont'd on next page)*

   c. HALL said that he believed Monie "tricked" him into carrying the cocaine. HALL said that Monie had previously asked him to "deliver something" but that he refused. HALL said he suspected Monie was asking him to deliver drugs.

   d. HALL acknowledged that it was suspicious that someone gave him a locked bag to take to Australia and said that he should have followed his instincts.

  **C.** **HALL possessed the SUBJECT DEVICES**

 21. HALL possessed the SUBJECT DEVICES in his carry-on luggage. HALL said he used one of the SUBJECT DEVICES to communicate with Monie.

  **V.** **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

 22. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

---

"Eco" and said that the Monie was the only person he knew associated with Eco. HALL said he had not booked a hotel or Airbnb, and that he had paid for his own ticket. HALL said he expected to be repaid.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether  participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.  Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

7

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23. As used herein, the term "digital device" includes the SUBJECT DEVICES.

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

8

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

      c.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

26.  For all the reasons described above, there is probable cause to believe that HALL has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

27.  Further, there is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 18th day of
February 2025.

*[signature: Patricia Donahue]*

HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

10